421 A.2d 234

**COMMONWEALTH of Pennsylvania**

v.

**David J. MALLON, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1979.

Filed July 3, 1980.

Arthur J. King, Assistant Public Defender, Norristown, for appellant.

John J. Burfete, Jr., Assistant District Attorney, Norristown, submitted a brief on behalf of Commonwealth, appellee.

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

CERCONE, President Judge:

Appellant takes this appeal from the judgment of sentence entered following his conviction, on a jury verdict, of robbery with an offensive weapon,[1] burglary,[2] conspiracy,[3] violation of the Uniform Firearms Act[4] and wantonly pointing a firearm.[5] Appellant raises several issues, all of which are discussed more fully below. However, none of appellant's issues have merit, therefore, we affirm.

1.  18 P.S. § 4705 (1945).

2.  18 P.S. § 4901 (1945).

3.  18 P.S. § 4302 (1945).

4.  18 P.S. § 4628 (1945).

5.  18 P.S. § 4716 (1945).

On September 21, 1969 at approximately 5:30 a. m., two men robbed the Sheraton Inn in Fort Washington, Pennsylvania, at gun point. The two robbers approached Gennaro A. Signore, an employee of the inn, who was alone at the time, and demanded that he empty the cash drawer. Both men had guns and one of these men, later identified as appellant, David J. Mallon, held a gun to Signore's head. The robbers were not satisfied with the $400.00 that was in the cash drawer and ordered Signore to lead them to the safe. Signore complied and appellant stayed with Signore near the safe while the other robber returned to the cash drawer. Instead of attempting to break into the safe, appellant ordered Signore to turn over his wallet, which Signore did without protest. The scene of the crime had been well lighted, and Signore was able to describe the robber who had taken his wallet as being Caucasian with light colored hair, who wore a suit, stood approximately six feet tall, and weighed roughly 190 pounds.

Subsequently, on October 3, 1969, at Philadelphia Police Headquarters, the victim, Signore, was shown between 50 and 80 slides of different individuals. After Signore had viewed about three–fourths of the slides, he saw one which he thought "looked familiar." This was a picture of appellant. The victim viewed the remainder of the slides, but did not identify anyone. Thereupon, the police showed the victim a photograph of appellant which was taken more recently than the slide. Signore looked at the photograph and positively identified it as being a picture of one of the gunmen. Appellant was arrested and, on October 20, 1969, appellant was put in a line–up in the presence of his attorney. Signore identified appellant in the line–up as being one of the men who committed the robbery.

Originally, appellant's trial was scheduled for June, 1970, however, trial had to be postponed because at that time appellant was in prison in New Jersey. While he was in prison, Pennsylvania obtained custody of appellant under the Interstate Agreement on Detainers Act.[6] Trial com-

6. See note 10, *infra*, and accompanying text.

menced on September 27, 1971, and guilty verdicts were returned that same day. At the conclusion of trial, the court postponed sentencing pending the disposition of post–verdict motions. Appellant then asked the court to transfer him back to New Jersey because he didn't like the Montgomery County jail, claiming it was "cruel and unusual punishment" to make him stay there and informed the court that he was willing to waive his rights under the Interstate Agreement on Detainers Act. Prior to the disposition of appellant's post–verdict motions on October 1, 1971, appellant was returned to New Jersey. After appellant's post–verdict motions were denied, Pennsylvania sought to have appellant returned from New Jersey for sentencing, but appellant now refused to return, arguing that Pennsylvania had violated Article IV(e) of the Interstate Agreement on Detainers Act. Thereafter, appellant unsuccessfully fought his return to Pennsylvania in the New Jersey courts when the New Jersey appellate court, on January 2, 1974, ruled that appellant must be returned to Pennsylvania.[7]

Appellant first argues that the lower court erred in denying his pre–trial motion for a continuance which appellant said he needed so that he might have more time to locate defense witnesses. The trial judge, in a well–written and thorough opinion, notes that appellant asked for the continuance ostensibly to procure the presence of a fourth alibi witness. The granting or denial of a continuance is a matter within the discretion of the court, which ruling will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Morgan*, 265 Pa.Super. 225, 401 A.2d 1182 (1979); *Commonwealth v. Hughes*, 264 Pa.Super. 118, 399 A.2d 694 (1979). Furthermore, when a continuance is sought for the purpose of obtaining the presence of a witness, the continuance properly may be denied where that witness' testimony would be merely cumulative. *Commonwealth v. Howard*, 466 Pa. 445, 353 A.2d 438 (1976). Inasmuch as

7. In addition to the delay caused by appellant's fighting extradition, some of the delay between conviction and sentencing was caused by the fact that appellant escaped from the New Jersey prison, although he was later recaptured.

appellant already had three alibi witnesses available to testify, we find no abuse of discretion in the trial court's denial of appellant's motion for a continuance.[8]

Appellant also contends that he had the right to have counsel present during the out–of–court photographic display conducted prior to appellant's arrest. It is settled that an accused has no right to have counsel present at a pre–arrest photographic display. *Commonwealth v. Scott,* 469 Pa. 258, 365 A.2d 140 (1976); *Commonwealth v. Smith,* 454 Pa. 515, 314 A.2d 224 (1973). Appellant further contends that the pre–trial line–up was unduly suggestive, alleging that only one other person in the line–up had light colored hair like appellant and the other members of the line–up huddled together so that appellant was more visible. The lower court held a hearing concerning these allegations, during which a photograph of the line–up itself was introduced into evidence. The judge found that appellant's allegations concerning the line–up were not supported by the facts and ruled that the line–up did not violate appellant's constitutional rights. In view of the judge's conclusion on the facts, we find no error in its ruling on the law.

Appellant also contends that his identification in the line–up was tainted by the prior, allegedly illegal, act of the police of showing the victim a single photograph, that of appellant's, immediately following the slide array. As this court said in *Commonwealth v. Steffy,* 264 Pa.Super. 110, 116, 399 A.2d 690, 693 (1979):

"In order to decide whether the appellant has been denied his constitutional rights, we must determine 'whether under the "totality of the circumstances" the identification was reliable even though, the confrontation procedure was suggestive.' *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382 [34 L.Ed.2d 401],

. . . . .

---

**8.** Inasmuch as the testimony of this fourth alibi witness, appellant's brother, was merely cumulative and constituted no basis for a continuance, the question of whether the testimony was also objectionable because appellant failed to comply with the notice requirements of former Pa.R.Crim.P. 312 is moot.

The United States Supreme Court has enunciated the factors which contribute to the 'totality of the circumstances' test as including '. . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' *Neil v. Biggers,* 409 U.S. at pp. 199–200, 93 S.Ct. at p. 382. See also *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)."

■ In the instant case, even if the police acted improperly in showing only one photograph to Signore, this does not necessarily mean that the subsequent line–up was tainted. As the trial court noted in its opinion, Signore had an excellent opportunity during the robbery to observe the holdup men. At the suppression hearing, Signore testified that he was with the holdup men for approximately fifteen minutes and that the men were in a well lighted area. Though one of the felons was wearing sunglasses, the man later identified as appellant was not, and Signore was able to give the police an accurate description of him. In all aspects, the "totality of the circumstances" test has been satisfied. Therefore, we find the lower court did not err by admitting the evidence of the line–up procedure at trial.[9]

Lastly, appellant argues that Pennsylvania violated the Interstate Agreement on Detainers Act,[10] Article IV(e), and that appellant should have been discharged according to the provisions of the Act. Article IV(e) provides:

"If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's

---

**9.** Appellant also argues that the evidence was insufficient to support a conviction because the victim's in–court identification of appellant was tainted by viewing the photograph. Though this is not, strictly speaking, an argument on the sufficiency of the evidence, we reject it in any event for the same reasons we held that the line–up was not tainted by the photograph.

**10.** The Interstate Agreement on Detainers Act is now found at 42 Pa.C.S. § 9101 *et seq.* (Supp.1979).

being returned to the original place of imprisonment . . . such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

■ We note at the outset that it has been held that the above–cited provision of the Interstate Agreement on Detainers Act [hereinafter IAD] is not a jurisdictional provision, but a personal statutory right. As such, it is waivable. *United States v. Palmer*, 574 F.2d 164 (3rd Cir. 1978), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978); *Camp v. United States*, 587 F.2d 397 (8th Cir. 1978); *United States v. Scallion*, 548 F.2d 1168 (5th Cir. 1977), *cert. denied*, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1977); *United States v. Ford*, 550 F.2d 732 (2nd Cir. 1977), *aff. sub nom.*, *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1977). Furthermore, although the Supreme Court has held that generally a "knowing and intelligent" waiver is required when constitutional rights are involved, *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *D. H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938),[11] the Court has never required this same high standard to be applied where rights deriving from a statute are at issue. Accordingly, the United States Court of Appeals for the Third Circuit has said: "When a claim of a fundamental right under the Constitution is at stake, the Supreme Court has determined that a strict waiver standard must be applied. Due process, however, does not compel the same strict standard when state–conferred rights are at stake." *United States ex rel. Payton v. Rundle*, 472 F.2d 36, 40 (3d Cir. 1972).

11. Concisely stated, a "knowing and intelligent" waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023.

In view of the above, it is therefore not surprising to find that of the courts which have ruled on the question of waiver of IAD rights by a defendant, the majority have found that the waiver need not meet the "knowing and intelligent" standard of *Zerbst*, merely a voluntary waiver [12] is sufficient. Ergo, in *United States v. Scallion, supra*, the court held that the prisoner waived his Article IV(e) rights by requesting prior to trial to be returned to his original place of imprisonment in another jurisdiction to attend his parole hearing. Similarly, in *United States v. Ford, supra*, the circuit court ruled that by requesting his transfer from state to federal authorities so that he might be closer to his family and to his attorney, a state prisoner waived his objections under Article IV(e). In *Gray v. Benson*, 458 F.Supp. 1209 (D.Kan.1978), it was held that a prisoner waived his Article IV(e) rights by requesting to be returned to state prison prior to completion of his federal prosecution so that he might receive adequate medical treatment.[13] Also on point is the decision in *United States v. Dixon*, 592 F.2d 329 (6th Cir. 1979), wherein the court found that a prisoner waived his Article IV(e) rights where a federal prosecutor made a written request for a temporary transfer of custody between federal and state jurisdictions at the behest of, and as a courtesy to, defense counsel, and where the purpose of the request was not to facilitate prosecution of outstanding federal charges, but was to permit defense counsel to confer

12. The meaning of a voluntary waiver in the context of the IAD was clarified by the court in *United States v. Eaddy*, 595 F.2d 341 (6th Cir. 1979). Therein the court noted that rights under Article IV can be waived by a "knowing and intelligent" waiver but the court went on to say that additionally "the substantive rights accorded to a prisoner under Article IV may be waived, even though the prisoner is not aware of these rights, where there is an affirmative request to be treated in a manner contrary to the procedures prescribed by Article IV(c) or (e)." *Id.* at 344. Therefore, where the prisoner himself or by his counsel requests the transfer, this can be said to be a voluntary waiver of Article IV rights.

13. In its opinion, the *Gray* court noted that if rights under the Detainers Act were not waivable, then a prisoner would not be able to request a pre–trial return to the sending jurisdiction for a parole hearing on other legitimate purpose because this would result in an automatic dismissal of the indictment.

with his client. Additionally, in *Camp v. United States*, 587 F.2d 397 (8th Cir. 1978), the court found a waiver of Article IV(e) rights where the prisoner voluntarily returned to the receiving state to enter a plea of guilty.[14]

█ In the instant case, appellant asked the trial court to order his return to the New Jersey prison because appellant liked those facilities better, and because appellant had a job in the New Jersey prison which he thought he might lose if he did not return shortly. Appellant even offered to formally and specifically waive his rights under the Interstate Agreement on Detainers Act, though, as case law tells us, such a "knowing and intelligent" waiver is not necessary to an effective waiver of statutory rights under the Act. The important fact is that appellant urged the trial court to return him to New Jersey. This is sufficient for a waiver.

It should be noted that this Court is aware of the fact that in *United States v. Mauro*, 544 F.2d 588 (2nd Cir. 1976), *rev'd on other grounds*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), that court ruled that Article IV(e) rights can only be waived by a "knowing and intelligent" waiver.[15] As did the court in *United States v. Eaddy*, supra, we specifically note our disagreement with this aspect of *Mauro*. Furthermore, we think the precedential value of the circuit court's opinion in *Mauro* is open to question. Aside from the fact that *Mauro* was ultimately reversed, albeit on other grounds, it is important to note that *United States v. Ford, supra*, a later

14. While it might be argued that *Camp* is distinguishable from the case *sub judice* because a guilty plea has been held to operate as a waiver of all non–jurisdictional defects or errors, *Camp v. United States, supra*, 587 F.2d at 399 and cases cited therein, it nonetheless is important to note that the court in *Camp* ruled on the question of whether a prisoner can be said to have waived a right of which he was not aware. On this issue, the court wrote, "[T]he IAD amounts to nothing more than a statutory set of procedural rules which clearly do not rise to the level of constitutionally guaranteed rights." *Id.* at 400.

15. The circuit court's opinion in *Mauro* was relied upon as authority in *Enright v. United States*, D.C. (1977), 434 F.Supp. 1056, *aff'd on reargument*, D.C. (1977), 437 F.Supp. 580, *reversed*, 573 F.2d 1289 (2nd Cir. 1978) (per curiam). *Enright* also held that Article IV(e) rights can only be waived by a "knowing and intelligent" waiver.

case decided in the same circuit as *Mauro*, found a waiver of Article IV(e) rights when the prisoner merely requested a transfer in order to be closer to his family and his attorney. *Ford* does not appear to require a "knowing and intelligent" waiver. Therefore, we do not find the circuit court's opinion in *Mauro* to be persuasive.[16]

Accordingly, finding no merit in any of appellant's arguments, we affirm.

Affirmed.

HOFFMAN, J., concurs in the result.

16. It may be that appellant's rights under the IAD Act were protected since appellant's trial was completed before he was returned to New Jersey; he simply was not sentenced. It would appear that if the IAD had meant tried and sentenced, it would have used the term "conviction" instead of "trial." We need not decide this issue now since we find that appellant clearly waived his IAD rights.