**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard Frederick DIXON, Defendant-Appellant.**

No. 77–5133.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 2, 1978.

Decided Feb. 13, 1979.

We conclude that the contentions of appellant are without merit and affirm his conviction.

Kurt A. Philipps, Covington, Ky., (Court-appointed), for defendant-appellant.

James K. Robinson, U. S. Atty., Christopher A. Andreoff, Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Before WEICK, Circuit Judge, PHILLIPS, Senior Circuit Judge, and LAWRENCE, Senior District Judge.*

PHILLIPS, Senior Circuit Judge.

Richard Frederick Dixon appeals from his conviction at a jury trial for air piracy, in violation of 49 U.S.C. § 1472(i), and kidnapping, in violation of 18 U.S.C. § 1201(a). Appellant presents a number of challenges to his conviction on the two charges. The two principal issues raised are: (1) whether the United States violated the Interstate Agreement on Detainers, 18 U.S.C. App. (1970); and (2) whether appellant was improperly convicted on both the kidnapping and air piracy charges.

## I

On January 19, 1972, Dixon was indicted by a Federal Grand Jury in the Eastern District of Michigan on charges of air piracy, in violation of 49 U.S.C. § 1472(i),[1] and kidnapping, in violation of 18 U.S.C. § 1201(a).[2] The airplane hijacking from which the present charges arose occurred on October 9, 1971, when Dixon, armed with a revolver, seized a flight attendant who was assisting boarding passengers on an Eastern Airlines jet at the Detroit Metropolitan Airport. Dixon then ordered the pilot to fly the plane to Cuba. Dixon apparently remained in Cuba for some time after the hijacking.

Approximately five years later, on January 9, 1976, Dixon was arrested by the Michigan State Police in connection with the murder of a police officer. During the course of the state investigation, state authorities discovered that Dixon was wanted by federal authorities on the air piracy and kidnapping charges. Federal authorities

---

* Honorable Alexander A. Lawrence, Senior Judge, United States District Court for the Southern District of Georgia, sitting by designation.

1. Section 1472(i) provides:
 **Aircraft piracy**
 (i)(1) Whoever commits or attempts to commit aircraft piracy, as herein defined, shall be punished—
 (A) by imprisonment for not less than 20 years; or
 (B) if the death of another person results from the commission or attempted commission of the offense, by death or by imprisonment for life.
 (2) As used in this subsection, the term "aircraft piracy" means any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States.
 (3) An attempt to commit aircraft piracy shall be within the special aircraft jurisdiction of the United States even though the aircraft is not in flight at the time of such attempt if the aircraft would have been with-

in the special aircraft jurisdiction of the United States had the offense of aircraft piracy been completed.

2. Section 1201(a) provides:
 **§ 1201. Kidnaping**
 (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:
 (1) the person is willfully transported in interstate or foreign commerce;
 (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
 (3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(32) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(32)); or
 (4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title,
 shall be punished by imprisonment for any term of years or for life.

were notified of Dixon's arrest by the Michigan State Police.

On March 29, 1976, Dixon was delivered from the Allegan County, Michigan, jail where he was being held by state authorities, to federal custody, pursuant to a writ of habeas corpus ad prosequendum issued on March 22, 1976. Upon his arrival in federal custody, Dixon was arraigned on the air piracy and kidnapping charges. At the time of Dixon's arraignment, federal authorities placed a detainer[3] on Dixon with state prison officials at the Allegan County jail. At this time, Dixon had not entered upon a term of imprisonment in any state or federal facility. Thereafter, Dixon was returned to state custody at the Allegan County facility.

Dixon was convicted of second degree murder in a Michigan Circuit Court on July 29, 1976. He was sentenced to life imprisonment on September 10, 1976. On September 15, 1976, he was sent to the Reception and Guidance Center of the state prison at Jackson, Michigan, for testing and final processing before his confinement. On September 22, 1976, the Guidance Center received from the Allegan County jail officials the federal detainer previously placed on Dixon.

A final pre-trial conference on Dixon's federal charges was scheduled for September 27, 1976. On or about September 3, 1976, Dixon's then counsel, John N. Thompson, of the Federal Defender's Office of the Legal Aid and Defender Association, Detroit, Michigan, asked Christopher A. Andreoff, the Assistant United States Attorney prosecuting the case, to have Dixon brought into federal custody by writ of habeas corpus ad prosequendum at the time of the final pre-trial conference. Thompson requested Dixon's presence at the final pre-trial conference so that he might discuss the case with Dixon. Because of logistical problems Thompson had been unable to confer with Dixon personally concerning the federal charges against him at any time prior to his request of Andreoff.[4] Andreoff had no intention of bringing Dixon into federal custody prior to trial and Dixon's presence was not required at the pre-trial conference. However Andreoff agreed to have Dixon delivered in time for the pre-trial conference as a courtesy to Thompson.

Pursuant to a writ of habeas corpus ad prosequendum granted on September 13, 1976, Dixon was delivered to federal authorities in Detroit on September 24, 1976, four days after the federal detainer was lodged at the Reception Center. Dixon appeared at the pre-trial conference on September 27, 1976, and requested new counsel or the right to represent himself at trial. Dixon was permitted to represent himself and Thompson was allowed to withdraw

**3.** A detainer is simply a notice filed with the institution in which a prisoner is serving a sentence, advising that the prisoner is wanted to face pending criminal charges elsewhere, and requesting the custodian to notify the filing jurisdiction prior to releasing the prisoner. Filing a detainer is an informal process that generally can be done by any person who has authority to take a prisoner into custody. Furthermore, a detainer remains lodged against a prisoner without any action being taken on it. *Ridgeway v. United States*, 558 F.2d 357 (6th Cir. 1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978). *See also United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

**4.** Mr. Thompson was appointed to represent appellant on the federal charges some time after appellant's arraignment on those charges on March 29, 1976. Mr. Thompson originally intended to visit appellant at the Allegan County jail where appellant was being held in state custody and sent appellant a letter to that effect. In several discussions with Mr. Andreoff, Mr. Thompson indicated that it would not be necessary to have appellant delivered from state to federal custody because he was planning to visit appellant at the Allegan County jail.

As a result of Mr. Thompson's schedule and because of the considerable distance between Detroit, where Mr. Thompson was located, and the Allegan County jail, Mr. Thompson concluded that he would not have an opportunity to meet with his client prior to the final pre-trial conference. Mr. Thompson informed Mr. Andreoff of these circumstances and Mr. Andreoff agreed to have appellant delivered to federal custody at the time of the pre-trial conference, for the sole purpose of allowing Mr. Thompson the opportunity to talk with appellant.

from the case. Another attorney from the Federal Defender's Office of the Legal Aid and Defender Association was appointed to assist Dixon in his pro se defense.

The pre-trial conference was completed on September 29, 1976, at which time the parties agreed to begin trial on November 16, 1976. Dixon requested that he be allowed to remain in federal custody for as many as 20 days, permitting him to work with his newly appointed counsel in the preparation of his case and any final motions that he might want to make. Andreoff pointed out that Dixon's state processing was being interrupted, but that he would be kept as long as possible in light of that difficulty. Dixon was returned to the Reception Center to complete his processing on October 15, 1976, and on the completion of that processing was confined, on October 26, 1976, in the State Prison of Southern Michigan at Jackson.

Prior to trial, Dixon filed a number of motions, including a motion to compel line-up and a motion to dismiss the indictment for failure to comply with the Interstate Agreement on Detainers. Pursuant to a writ of habeas corpus ad prosequendum, Dixon was delivered again to federal authorities on November 4, 1976, for a decision on his pre-trial motions and for trial. Pre-trial hearings on Dixon's motions were held, after which the motions were denied. Dixon's trial commenced on December 7, 1976, and on December 16, 1976, the jury returned a verdict of guilty on both counts of the indictment. Dixon was sentenced to twenty year terms of incarceration on each count of the indictment, the sentences to run consecutively and consecutive to the life sentence Dixon received for his second degree murder conviction in Michigan Circuit Court.

This appeal followed.

## II

 Congress enacted the Interstate Agreement on Detainers Act[5] in 1970, joining the United States and the District of Columbia as parties to the Interstate Agreement on Detainers (Agreement), to which 46 states are signatories. The Agreement attempts to remedy the disadvantages and hardships imposed upon prisoners attendant with the use of detainers and to eliminate potential abuses of the detainer system.[6] Accordingly, the Agreement encourages the expeditious disposition of outstanding charges by providing the prisoner with a method of clearing detainers and charges outstanding against him. It further provides cooperative proceedings governing temporary transfers of prisoners for purposes of trial on outstanding charges among the participating jurisdictions to aid such disposition. In either case, the provisions of the Agreement are applicable only when a participating jurisdiction, having untried charges pending against a prisoner, first lodges a detainer with the participating jurisdiction where the prisoner is incarcerated. *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

5. Pub.L. No. 91–538, §§ 1–8, 84 Stat. 1397 (1970), reprinted in 18 U.S.C.A. App. at 271 (Supp.1978).

6. Article 1 of the Agreement sets forth some of the reasons for its adoption, to wit:

Article I

The party States find that charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and deter-

mination of the proper status of any and all detainers based on untried indictments, informations, or complaints. The party States also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures. *See also United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *Ridgeway v. United States*, 558 F.2d 357 (6th Cir. 1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978); *United States v. Ford*, 550 F.2d 732 (2d Cir. 1977), *aff'd sub nom., United States v. Mauro, supra.*

The central provisions of the Agreement are Article III and Article IV. Article III sets forth the procedure by which a prisoner against whom a detainer has been filed can demand a speedy disposition of the charges giving rise to the detainer. If a prisoner demands a speedy trial pursuant to the guidelines of Article III, the jurisdiction which filed the detainer is required to bring him to trial within the Article III(a) time limit. Failure to comply will result in a dismissal of the outstanding charges, with prejudice. Article III(d) also requires the disposition of all outstanding charges in a jurisdiction prior to the return of the prisoner to the original place of incarceration. Any charges left untried after the prisoner has been returned to the original place of incarceration will be dismissed with prejudice. *United States v. Mauro, supra; United States v. Ford*, 550 F.2d 732 (2d Cir. 1977), *aff'd sub nom., United States v. Mauro.*

■ Article IV provides a means by which a prosecutor, who has lodged a detainer against a prisoner in another participating jurisdiction, can secure temporary custody of a prisoner for disposition of the outstanding charges against the prisoner. Once a prosecuting authority has gained temporary custody over a prisoner by a "written request" to the jurisdiction of incarceration (Art. IV(a)), two limitations are placed on the "requesting" prosecutor. Article IV(c) requires that trial must commence within 120 days of the prisoner's arrival in the requesting jurisdiction, unless a continuance is granted for good cause in open court with the prisoner or his counsel present. *Ridgeway v. United States*, 558 F.2d 357 (6th Cir. 1977) *cert. denied*, 436 U.S. 946, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978). Article IV(e) provides:

"If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint

shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

Thus, if a prosecuting jurisdiction takes the initiative to bring a prisoner, against whom it has lodged a detainer, from the jurisdiction of incarceration into its temporary custody for disposition of outstanding charges against the prisoner, the requesting jurisdiction must complete the prosecution before returning the prisoner to the jurisdiction of incarceration. *See United States v. Cyphers*, 556 F.2d 630, 635 (2d Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977).

Appellant contends that, pursuant to Article IV(e) of the Agreement, the federal air piracy and kidnapping indictment against him should have been dismissed because he was returned from temporary federal custody to his original place of incarceration, while under a detainer, without disposition of the federal charges outstanding against him. Appellant argues that the decision in *United States v. Mauro, supra*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329, is dispositive of this claim and requires dismissal of the federal indictment against him.

In *Mauro*, the Supreme Court held that issuance of a writ of habeas corpus ad prosequendum by a federal court to state authorities, to secure a state prisoner for trial on criminal charges, is not a detainer within the meaning of the Agreement and therefore does not trigger its application, 436 U.S. at 349, 98 S.Ct. 1834.[7] However, where the United States lodged a detainer against a state prisoner, triggering application of the Agreement's provisions, a writ of habeas corpus ad prosequendum will be considered a "written request for temporary custody" within the meaning of Article IV and the United States will be bound by the terms of the Agreement. The Court stated:

Once the Federal Government lodges a detainer against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the

---

7. This court held to the same effect in *Ridgeway v. United States, supra*, 558 F.2d 357 (6th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2856, 56 L.Ed.2d 788 (1977).

United States must comply with its provisions. And once a detainer has been lodged, the United States has precipitated the very problems with which the Agreement is concerned. Because at that point the policies underlying the Agreement are fully implicated, we see no reason to give an unduly restrictive meaning to the term "written request for temporary custody." It matters not whether the Government presents the prison authorities in the sending State with a piece of paper labeled "request for temporary custody" or with a writ of habeas corpus *ad prosequendum* demanding the prisoner's presence in federal court on a certain day; in either case the United States is able to obtain temporary custody of the prisoner. Because the detainer remains lodged against the prisoner until the underlying charges are finally resolved, the Agreement requires that the disposition be speedy and that it be obtained before the prisoner is returned to the sending State.

436 U.S. at 361–62, 98 S.Ct. at 1848.

■ We agree with appellant that *Mauro* and Article IV(e) mandate that when a state prisoner, subject to a detainer, is taken into federal custody by a writ of habeas corpus ad prosequendum "for the purpose of permitting prosecution" on pending federal charges, disposition of those charges must precede the prisoner's return to state custody. Failure to do so will result in dismissal of the charges against the prisoner, with prejudice.

■ However, we do not find *Mauro* dispositive of the question presented in this case; that is, whether there is a violation of Article IV(e) where a prosecutor makes a "written request for temporary custody" at the behest of, and as a courtesy to defense counsel, and where the purpose is not to facilitate prosecution of outstanding federal charges but to permit defense counsel to confer with his client concerning the charges. When the prisoner is thereafter returned to state custody without a disposition of outstanding federal charges we do not believe the Agreement has been violat-

ed. We conclude that neither *Mauro* nor the Agreement contemplates this situation.

The purpose of Article IV is to provide "the means by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges." *United States v. Mauro, supra,* 436 U.S. at 351, 98 S.Ct. 1842. *See also United States v. Ridgeway, supra,* 558 F.2d at 360; *Unites States v. Ford, supra,* 550 F.2d at 741; *United States v. Mauro,* 544 F.2d 588, 590–91 (2d Cir. 1976), *rev'd,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). The legislative history surrounding the adoption of the Agreement by the Congress on behalf of the United States and the District of Columbia is relatively sparse. Some insight is provided, however, as to the reasons for including Article IV in the Agreement:

> The agreement also provides a method whereby prosecuting authorities may secure prisoners serving sentences in other jurisdictions for trial before the expiration of their sentences and before the passage of time has dulled the memory or made witnesses unavailable.

> \* \* \* \* \* \*

> As was stated, prosecutors also can initiate proceedings to obtain trials of prisoners in other jurisdictions against whom charges are pending or detainers have been lodged. A request is made to appropriate officials in the jurisdiction in which the prisoner is being held. Unless the request is disapproved by the Governor of the State having custody within 30 days, temporary custody is given to the prosecutor for the purpose of transferring the prisoner and holding trial.

S.Rep.No.91–1356, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News, 4864, 4865.

Furthermore, Article IV(a) of the Agreement provides, in part:

> (a) The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against

whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability.

Thus, the clear intent of Article IV is to facilitate the expeditious disposition of outstanding detainers against prisoners. This is accomplished by making prisoners readily available to prosecuting authorities by the authorities' mere "written request for temporary custody or availability." *See United States v. Ford, supra,* 550 F.2d at 741. Article V(d) defines "temporary custody," as follows:

(d) The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction.

Article IV(e), by its terms, is applicable to "temporary custodies," which are to facilitate prosecution of the prisoner. It does not comprehend the situation presented in this case, where the writ of habeas corpus ad prosequendum was issued solely for the benefit of the defense.

The limitations imposed by Article IV(c) and (e) upon the prosecutor of a "requesting" jurisdiction are necessary corollaries to those imposed by Article III of the Agreement. Without the Article IV limitations, prosecutors could avoid the limitations prescribed by Article III by merely arraigning the prisoner without any intention of granting a prompt trial. *United States v. Ford, supra,* 550 F.2d at 741. In speaking of the purpose of Article IV and the need for the restriction imposed by Article IV(e), Judge Mansfield noted in his dissenting opinion in

*United States v. Mauro, supra,* 544 F.2d at 597:

The purpose of Art. IV is to assure that states which formerly were powerless to obtain production of prisoners held by other states or by the federal government will now be able to secure their presence, subject to certain conditions. One of these conditions is that the receiving state, after obtaining the detained prisoner merely upon request, will not abuse that privilege by returning him untried, since this would have the effect of reinstating and indefinitely prolonging the detainer lodged against him by the receiving state, with its detrimental effects.

The Supreme Court, in *Mauro,* adopted the reasoning of Judge Mansfield with respect to the purpose of Article IV(e).[8]

 In *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 834 (3d Cir. 1975), the Third Circuit noted:

The purpose of the Article IV provisions is to insure that interruptions of the sending jurisdiction's incarceration are minimized, and in exchange for the small added hardship placed on the prosecutor of the demanding state regarding time limits, a simplified procedure for obtaining the defendant's presence is made available.

Article IV(e) is intended to prevent prosecutorial abuse of the simplified method for obtaining prisoners for the disposition of outstanding charges against them, a privilege made available to prosecutors under Article IV. The sanction set forth in Article IV(e) is designed to effectuate that purpose. It is in that context that we find Article IV(e) not applicable to the facts in this case and, therefore, conclude that there was no violation of the Agreement.[9]

We reemphasize that authorities lodged a detainer against appellant with Allegan

8. 436 U.S. 340, 361 n. 26, 98 S.Ct. 1834, 56 L.Ed.2d 329.

9. We recognize that Article IV(e) is for the benefit of the prisoner and is waivable. *United States v. Ford, supra,* 550 F.2d at 735; *United States v. Palmer,* 574 F.2d 164 (3rd Cir.), *cert.*

*denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978). In light of our decision, however, we do not reach the question whether the appellant's rights under IV(e) were waived because appellant was brought into federal custody at the request of his attorney.

County, Michigan, jail officials on March 29, 1976. On July 29, 1976, appellant was convicted of murder in Michigan Circuit Court. Appellant began his term of imprisonment on that conviction on September 10, 1976, at the State Prison at Jackson. Appellant was taken into federal custody pursuant to a writ of habeas corpus ad prosequendum on September 24, 1976, but was returned to the State Prison at Jackson on October 15, 1976, without a disposition of the federal charges.

While it is true that appellant was delivered into federal custody at the "request" of the Assistant United States Attorney, that request was initiated by appellant's then counsel, Mr. Thompson, and appellant's presence in federal custody was, in all respects, solely for the benefit of appellant and Mr. Thompson. As Mr. Thompson testified at a pre-trial hearing on appellant's motion to dismiss the federal indictment:

> I spoke to Mr. Andreoff and requested that Mr. Dixon be brought here on a writ since I had not yet had an opportunity to speak to him personally and I didn't see any chance of me being able to get out to Allegan County any time within the near future, so I requested that Mr. Dixon be present for the pretrial.
>
> \* \* \* \* \* \*
>
> Well, ever since I first was assigned the case, I had spoken to Mr. Andreoff, and he indicated to me then that—well, he asked me if I wanted to have Mr. Dixon brought in on a writ so I could talk to him, and I told him no, because I intended to go out and talk to him myself later, and I had several conversations with Mr. Andreoff.
>
> Probably at some point in all of those conversations, at least one of them, I indicated to him that I did not see how I was going to get out there, and I asked that he bring Mr. Dixon in on a writ since the pretrial was scheduled for September 27.

Appendix, pp. 141–42. In order for defense counsel to have his client brought to him for consultation, it was necessary that he avail himself of the power of the prosecutor to have issued a writ of habeas corpus ad prosequendum. The Assistant United States Attorney had not intended to have the appellant delivered into federal custody until the time of the trial and appellant's delivery into federal custody on September 24, 1976, was done as a "courtesy" to defense counsel.

It is readily apparent that the actions of the Assistant United States Attorney here do not present a potential for nor amount to an abuse of the privilege of easy prisoner access for the purpose of disposition of outstanding charges, which Article IV(e) is intended to proscribe. The issuance of the September 13, 1976, writ of habeas corpus ad prosequendum was to allow appellant's counsel the opportunity to meet with his client concerning the kidnapping and air piracy charges. To allow appellant to assert the sanction of Article IV(e) under these facts would permit form to prevail over substance. The transfer of appellant in this case pursuant to a writ of habeas corpus ad prosequendum does not mandate application of a sanction, the purpose of which is to protect prisoners from the abuse of a privilege granted to prosecutors allowing them easy access to the prisoners. Application of the Article IV(e) sanction in the instant case would permit appellant a windfall benefit under circumstances not contemplated by the sanction.

We are cognizant of the Article IX proviso directing a liberal interpretation of the Agreement so as to effectuate its purposes. However, we also note that the legislative history of the Agreement states:

> The agreement gives the prisoner no greater opportunity to escape a conviction, but it does provide him with a procedure for bringing about a prompt test of the substantiality of detainers placed against him by other jurisdictions.

S.Rep.No.91–1356, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News, 4864, 4865.

A superficial examination of the use of the writ in the present case might suggest that it is a "written request for temporary custody" as defined by the Supreme Court in *Mauro,* under the terms of the Agree-

ment. A more realistic appraisal of what we have here is the use of a writ of habeas corpus ad prosequendum for the purpose of permitting defense counsel to confer with his client. We, conclude therefore, that Article IV(e) does not apply under the facts presented in the instant case.

### III

Appellant was convicted of air piracy, in violation of 49 U.S.C. § 1472(i), and kidnapping, in violation of 18 U.S.C. § 1201(a). Appellant contends that § 1472(k)(1) of the air piracy statute expressly limits the offenses which can be joined and tried with air piracy. Kidnapping is not embraced by § 1472(k)(1), and therefore, appellant argues, the government is estopped, by prosecuting him under § 1472(i), from proceeding against him under § 1201 (kidnapping). Appellant further suggests that the offenses of air piracy and kidnapping should merge under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

In 1961, Congress amended the Federal Aviation Act of 1958, making it a federal crime to exercise control, by threat of force with wrongful intent, of "an aircraft in flight in air commerce," § 902(i), 75 Stat. 466, 49 U.S.C. § 1472(i). The Act was further amended by adding, among other subsections, subsection (k), which provides, as follows:

*Certain crimes aboard aircraft in flight*

(k)(1) Whoever, while aboard an aircraft within the special aircraft jurisdiction of the United States, commits an act which, if committed within the special maritime and territorial jurisdiction of the United States, as defined in section 7 of Title 18, would be in violation of section 113, 114, 661, 662, 1111, 1112, 1113, 2031, 2032, or 2111 of such Title 18 shall be punished as provided therein.

(2) Whoever, while aboard an aircraft within the special aircraft jurisdiction of the United States, commits an act, which, if committed in the District of Columbia would be in violation of section 9 of the Act entitled "An Act for the preservation of the public peace and the protection of property within the District of Columbia", approved July 29, 1892, as amended (D.C.Code, sec. 22–1112), shall be punished as provided therein.

The addition of subsection (k) extended Federal criminal laws to certain acts committed on board aircraft, including assault, maiming, murder, manslaughter, rape, and robbery.

The legislative history surrounding the 1961 amendments demonstrates Congress' concern over the peculiar problem of enforcement of state laws for criminal acts perpetrated in aircrafts in flight. The House of Representatives Report on the 1961 amendments underscored the great need for the legislation:

[I]n the case of crimes committed in the airspace over States of the United States, most of the acts with which this legislation deals would be violations of the laws of one or more of such States. However, crimes committed in the airspace over a State pose peculiar and extremely troublesome problems of enforcement which are not present when such crimes take place on the ground. When a criminal moves the scene of his activity to an aircraft in flight he is able to take advantage of practical and physical difficulties that may seriously impair effective apprehension and prosecution, particularly if the offense is one against the law of a State rather than against Federal law. Furthermore, in the case of offenses against State law, State officials are often faced with an insuperable task in trying to establish that a particular act occurred in the airspace over that State— and in some cases, under State law, it would be necessary to prove that the offense was committed over a particular county in the State. It is obvious that such proof may be very difficult and often impossible if the offense is committed on a jet aircraft traveling at 600 miles per hour at an altitude of 30,000 feet.

\* \* \* \* \* \*

Although State criminal statutes generally cover crimes committed on board aircraft in flight over the State, the advent of high-speed high-altitude flights of modern jet aircraft has complicated the problem of establishing venue for the purposes of prosecution. In some recent instances, serious offenses have gone unpunished because it was impossible to establish to any reasonable degree of accuracy the State over which the crime was committed.

H.R.Rep.No.958, 87th Cong. 1st Sess. (1961), *reprinted in* [1961] U.S.Code Cong. & Admin.News, 2563–64.

The section-by-section explanation of the 1961 amendments provides further insight into Congress' addition of subsection (k) to § 1472. That explanation states, in part:

Paragraph (1) would provide the same penalties for crimes such as assault, maiming, murder, manslaughter, rape, and robbery, when committed aboard an aircraft in flight in air commerce, as are provided for such crimes by specific provisions of title 18 of the United States Code, when committed within the "special maritime and territorial jurisdiction of the United States," as that term is defined by section 7 of such title 18. The crimes referred to would be punishable regardless of whether there was any connection between the specific crime and the offense of aircraft piracy.

As has been heretofore pointed out in this report, these crimes normally involve acts which are offenses under State law, but the difficulties of prosecution under State law make it desirable to provide that these crimes also shall be offenses under Federal law when committed aboard aircraft in flight in air commerce. (Footnote omitted.) H.R.Rep.No.958, 87th Cong. 1st Sess. (1961), *reprinted in* [1961] U.S.Code Cong. & Admin.News, 2563, 2570–71.

■ Appellant's contention that § 1472(k) limits the crimes that can be joined with aircraft piracy is untenable. The intent of Congress in amending 49 U.S.C. § 1472 to include subsection (k) does not portend to limit to the § 1472 crimes those which can be prosecuted with air piracy. To the contrary, § 1472(k) seeks to supplement state laws, in an area in which they have proved inadequate, by giving the Federal Government concurrent jurisdiction over crimes committed on board aircraft in flight. Kidnapping is not a crime peculiarly within the province of the States, as are those crimes included in § 1472(k). Furthermore, when a kidnap victim is transported in interstate commerce, or specifically when a person is seized within the special aircraft jurisdiction of the United States as defined in 49 U.S.C. § 1301(34),[10] the federal kidnapping statute is applicable and, therefore, there is no need to include kidnapping within the scope of § 1472(k).

The fundamental rule concerning prosecution of two offenses was enunciated in *Blockburger v. United States, supra,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), wherein the Supreme Court stated:

[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182.

*See also United States v. Shelton,* 573 F.2d 917, 919 (6th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978).

■ The crime of aircraft piracy is defined in 49 U.S.C. § 1472(i)(2), as follows:

(2) As used in this subsection, the term "aircraft piracy" means *any seizure or exercise of control,* by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, *of an aircraft* within the special aircraft jurisdiction of the United States. (Emphasis added.)

Thus, the elements of proof required under an air piracy charge are: (1) Seizure or exercise of control of an aircraft; (2) by

10. 18 U.S.C. § 1201(a)(3).

force, violence, or intimidation, or the threat thereof; (3) with wrongful intent; (4) while in the special aircraft jurisdiction of the United States. As the legislative history concerning the addition of subsection (i) to § 1472 reveals, the critical element of the crime is the aircraft seizure:

> The proposed new subsection (i) would define the offense of "aircraft piracy" and provide penalties for anyone who commits or attempts to commit such offense. This is the provision of the bill which is aimed at the acts commonly referred to in the press as the "hijacking" of aircraft.

H.R.Rep.No.958, 87th Cong. 1st Sess. (1961), *reprinted in* [1961] U.S.Code Cong. & Admin.News, 2563, 2567.

Kidnapping, on the other hand, involves the seizure of a person, 18 U.S.C. § 1201(a) provides, in part:

### § 1201. Kidnaping

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof
>
> . . .

In *Durns v. United States,* 562 F.2d 542, 545 n. 5 (8th Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977), the statutory elements to establish the crime of kidnapping under § 1201 were listed:

> 5. The elements are:
>
> (1) interstate transportation of the victim;
>
> (2) lack of consent;
>
> (3) holding for ransom, reward or otherwise;
>
> (4) the doing of such acts knowingly and willfully.
>
> (Citations omitted.)

The District of Columbia Court of Appeals noted, in *United States v. Wolford,* 144 U.S.App.D.C. 1, 8, 444 F.2d 876, 883 (1971), that " 'the heart of the crime' of kidnapping is a seizure and detention against the will of the victim."

In *United States v. Healey,* 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964), the Supreme Court upheld a two-count indictment charging kidnapping and air piracy where the accused kidnapped the pilot of a private airplane, at gunpoint, and forced the pilot to fly them from Florida to Cuba. In *Wolford, supra,* that court was confronted with the question whether the crime of kidnapping, which was perpetrated during the course of and in furtherance of an armed robbery, merged into the armed robbery charge. The *Wolford* court relied on *Healey* in concluding that the two crimes did not merge, and stated of *Healey*:

> And *United States v. Healey, supra,* is an even better example of applying the kidnaping statute where another crime (air piracy) is committed contemporaneously with the kidnaping.

444 F.2d at 882–83.

■ In this case we have two distinct acts resulting in two crimes, defined by separate statutes that are not in *pari materia.* Here, appellant seized, at gunpoint, the flight attendant who was positioned at the plane's forward loading door, while passengers were still boarding the airplane. Subsequently, by threat of force, appellant commandeered the aircraft to Cuba. The kidnapping charge required proof of the seizure of the flight attendant. The air piracy charge, on the other hand, required proof of the seizure of an aircraft. While the element of force, necessary to proving the charge of air piracy, may have been the threat to the safety of the flight attendant, that in no way alters the fact that she was kidnapped. The application of both the kidnapping and air piracy statutes to the facts of this case is thus entirely proper.

The court has considered the other grounds asserted by appellant for reversal and finds them to be without merit.

The judgment of the district court is affirmed.