**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wayde Lynn KURT, Defendant–**
**Appellant.**

**Nos. 90–30358, 90–30374 and 90–30400.**

United States Court of Appeals,
Ninth Circuit.

Submitted June 12, 1991 *.

Decided Sept. 16, 1991.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Mark E. Vovos, Spokane, Wash., for defendant-appellant.

Robert S. Linnell, Asst. U.S. Atty., Yakima, Wash., for plaintiff-appellee.

Before BRUNETTI and RYMER, Circuit Judges, and SHANSTROM **, District Judge.

SHANSTROM, District Judge:

Appellant Wayde Lynn Kurt appeals three separate orders from the Eastern District Court of Washington. District Judge Quackenbush issued the first order on September 12, 1990, dismissing *without prejudice* Kurt's conviction for possession of counterfeiting paraphernalia. Circuit Judge David Thompson, sitting by designation, issued the remaining two orders on October 9, 1990, dismissing *without prejudice* Kurt's convictions for possession of an unregistered firearm and for bail jumping. All three of these orders were consolidated for the purpose of appeal on June 6, 1991. In each instance, the district court found violations of the Interstate Agreement on Detainers Act (IADA), Title 18, United States Code, Appendix III (1990). After analyzing the pertinent factors listed in

Section 9 of the IADA, however, both judges held that the circumstances surrounding the IADA violations warranted dismissal without prejudice.

Kurt appeals each of the district court orders on the same issue: whether the district court abused its discretion under Section 9 of the IADA by dismissing the criminal convictions without prejudice after finding IADA violations. We affirm the separate district court decisions.

## FACTUAL BACKGROUND

Not only do Wayde Kurt's appeals contain a single unifying issue, they arise from the same event. In a search conducted in late 1987, investigative authorities found a machine gun and counterfeiting paraphernalia in Kurt's possession. On January 12, 1988, the grand jury indicted him for possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (1988). On February 9, 1988, the grand jury indicted him a second time for possession of counterfeiting paraphernalia, a violation of 18 U.S.C. § 471 (1988), and for counterfeiting, a violation of 18 U.S.C. § 474 (1988). After the district court released him on bond, however, Kurt failed to appear as notified in proceedings on the machine gun charge. On November 15, 1988, the grand jury indicted him for failure to appear, a violation of 18 U.S.C. § 3146(a) (1988).

Prior to his trial on any of these indictments, Kurt was arrested, tried, convicted, sentenced and incarcerated in Oregon on state charges separate from those federal charges pending in Washington. On February 10, 1989, while Kurt was serving his Oregon sentence, the United States Marshal placed a detainer against him. Not until November 30, 1989 did the Washington court issue a writ of *habeas corpus ad prosequendum*. That same day, the court arraigned Kurt and appointed counsel to represent him.

The U.S. Marshal held Kurt in the Franklin County Jail pursuant to a housing

** Honorable Jack D. Shanstrom, United States District Judge for the District of Montana, sitting by designation.

agreement between the federal authorities and the county. The jail had no library facilities available to prisoners. District Judge Quackenbush later remarked in his dismissal order that heavy criminal dockets had severely taxed the available criminal pre-trial housing during the time Kurt was held there. Consequently, when Kurt filed a motion for access to a law library on December 18, 1989, the court, after some contemplation, ordered him removed to the Eastern Oregon Correctional Institution. The court ordered the move *sua sponte* on December 30, 1989 to accommodate Kurt's library needs—neither he nor the government had an opportunity to object at a hearing. The order also set the trial date on the machine gun and bail jumping charges for April 2, 1990.

This order was not executed immediately. On January 15, 1990, Kurt wrote to the Clerk of Court for the Eastern District of Washington to complain about the lack of action on his transfer to Oregon. The letter was received by the Clerk on January 25, 1990. In the meantime, the U.S. Marshal did transfer Kurt to the Eastern Oregon Correctional Institution at Pendleton, Oregon. The Marshal returned him to Washington on February 21, 1990. The court did not issue a new writ for this transfer.

Upon his return, Kurt immediately moved to dismiss the pending charges on the basis of an IADA violation. Specifically, Kurt cited the "anti-shuffling" provision found in Article IV(e) of the IADA. He argued his motion at the pre-trial conference on March 2, 1990. The court denied the motion and, on March 7, 1990, ordered Kurt transferred back to Oregon. Once again, the court ordered the return *sua sponte* without notice to Kurt or an opportunity for a hearing.

On April 4, 1990, Kurt was transferred to Washington for the third and final time. Judge Thompson tried him on the firearm and bail jumping charges five days later, and the jury found him guilty on April 11, 1990. Kurt's conviction on these charges came 129 days beyond his first transfer to the jurisdiction of the Washington federal court. By reason of excludable time pursuant to the Speedy Trial Act, 18 U.S.C. 3161(h)(8)(A) (1988), however, the court found no violation of Kurt's statutory speedy trial rights. On May 21, 1990, trial commenced before Judge Quackenbush on the counterfeiting charges. The jury found Kurt guilty on Count II of the indictment, possession of counterfeiting paraphernalia, but was unable to reach a verdict on Count I, counterfeiting. Once again, the court found no Speedy Trial Act violation. Throughout these cases, Kurt maintained his challenge to the courts' jurisdiction on the basis of well-documented violations of the "anti-shuffling" and 120-day deadline provisions found in Article IV(c) & (e) of the IADA.

After each of his three convictions, Kurt moved for Arrest of Judgment and Dismissal pursuant to Article IV of the IADA. On August 17, 1990, the parties and their attorneys appeared before Judge Quackenbush to settle the factual issues underlying the IADA violations. The court then prepared a draft of its Findings of Fact and circulated it to the parties. No objections challenging the court's findings were filed. On September 12, 1990, Judge Quackenbush incorporated these findings into an order dismissing the cause without prejudice. On October 4, 1990, Judge Thompson followed suit and also dismissed without prejudice.

In cross-referenced opinions, both judges found that the United States, as a receiving state, violated Article IV of the IADA. Although this aspect of the dismissal orders is not subject to review on appeal, the court's opinions deserve some attention. At no time did Kurt initiate his transfer to Oregon. By the same token, neither did the government. Kurt was transferred by order of the federal court. Both judges found that the transfers violated Article IV(e) mandating that the receiving state try a prisoner of a sending state before returning him or her. In addition, both judges found violations of Article IV(c) because the trials commenced beyond 120 days of Kurt's arrival in the receiving state. Neither judge found good cause for

the delay. All convictions were dismissed on the basis of these Article IV violations.

In addition to these findings, both judges analyzed the factors listed in Section 9(1) of the IADA before dismissing the cases. Section 9(1) provides:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: The seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice.

Both agreed that these factors, when applied to the common facts, warranted dismissal without prejudice. Kurt now timely appeals each of the dismissal orders on the issue of whether the court erred by not dismissing with prejudice.

### DISCUSSION

██ Congress enacted the IADA in 1970 to "encourage the expeditious and orderly disposition of ... charges [outstanding against a prisoner in another jurisdiction] and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." 18 U.S.C. App. III, § 2, Art. I. The Act provides a cooperative procedure governing the temporary transfer of prisoners to dispose of untried charges through the process of lodging a detainer. *See United States v. Dixon*, 592 F.2d 329, 333 (6th Cir.1979), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Once a participating jurisdiction lodges a detainer in another participating jurisdiction where the prisoner is held, the prisoner can demand a speedy disposition of the charges. *United States v. Reed*, 910 F.2d 621, 624 (9th Cir.1990).

These procedures, beyond maintaining the principles of interstate comity, serve to protect the prisoner from the uncertainties inherent in untried charges that "obstruct programs of prisoner treatment and rehabilitation." *United States v. Mauro*, 436 U.S. 340, 351, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329 (1978) (citing 18 U.S.C. App.

III, Art. I). They serve to prevent prosecutorial abuses of the detainer that potentially allow a prisoner to languish in a separate jurisdiction under the constant but uncertain threat of further prosecution. *See, e.g., United States v. Ford*, 550 F.2d 732, 737–39 (2d Cir.1977) (reviewing the effects of pre-IADA detainers), *aff'd sub nom. United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

Articles III and IV supply the teeth of the IADA. Once a detainer is filed against a prisoner, Article III allows the prisoner to demand a disposition of the charges within 180 days. Should the prisoner fail to make an Article III request, the provisions of Article IV require that "trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State...." 18 U.S.C. App. III, Art. IV(c). In addition, Article IV prevents the receiving state from returning the prisoner until the trial is completed, otherwise "the court shall enter an order dismissing the [indictment, information or complaint] with prejudice." 18 U.S.C. App. III, Art. IV(e).

It is well settled that Congress intended the United States to participate in the IADA. *Mauro*, 436 U.S. at 354, 98 S.Ct. at 1844. However, where the United States is the receiving state and where the IADA mandates dismissal of the charges, a second tier of analysis supplants the unequivocal dismissal with prejudice applicable to other states. Notwithstanding other provisions in the IADA to the contrary, Section 9(1) provides that the federal court may dismiss an indictment, information, or complaint with or without prejudice after considering each of the factors listed in the section.

██ Appellate review of dismissal orders under Section 9 must embrace the fact-specific nature of the inquiry. Both judges involved in this appeal properly considered the factors listed in Section 9(1) before dismissing without prejudice. Their orders hinged upon the unique circumstances of Kurt's three cases. In *United States v. Reed*, 910 F.2d 621, 626 (9th Cir.1990), we noted the similarity of the factors found in

Section 9(1) to those governing dismissal under the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1988), and held that appellate review should follow the example set in Speedy Trial Act dismissal cases. *Id.* Therefore, consistent with the treatment of Speedy Trial Act dismissals, we review the Washington district court decisions for abuse of discretion. *United States v. Taylor*, 487 U.S. 326, 335, 108 S.Ct. 2413, 2418–19, 101 L.Ed.2d 297 (1988); *United States v. White*, 864 F.2d 660, 661 (9th Cir.1988).

In each of his appeals, Kurt takes exception to the plain language of the IADA. Since the adoption of Section 9, Pub.L. No. 100–690, Title VII, Subtitle B, Sec. 7059, 102 Stat. 4181, 4403 (Nov. 18, 1988), federal courts have had the option to dismiss without prejudice in cases involving IADA violations where the United States is the receiving state. Kurt contends that this option has left Articles III and IV of the IADA without practical effect when the United States lodges a detainer. He argues that the courts in this case and in *United States v. Iwuamadi*, 716 F.Supp. 420 (D.Neb.1989), *aff'd*, 909 F.2d 509 (8th Cir.1990), have mistakenly construed Section 9 consistent with Speedy Trial Act cases without regard for the purposes of the IADA. This argument is without merit when applied to the facts of this case.

Whether or not Section 9 has eviscerated the remedial provisions found in Articles III and IV is a matter for legislative, not judicial, review. Nevertheless, the third factor in Section 9(1) anticipates the thrust of Kurt's argument by requiring the court to consider "the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice." Therefore, it is within the district court's discretion to decide whether a particular order comports with the legislative purposes found in Article I of the IADA.

Consideration of the first two factors found in Section 9(1) also requires the exercise of judicial discretion. As recognized by the United States Supreme Court, "discretionary choices are not left to the court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (quoting *United States v. Burr*, 25 F.Cas. 30, 35 (No. 14,692d) (CC Va.1807)). In the *Kurt* cases before us on appeal, the IADA itself required each district court to "consider [the three] factors as applied to the particular case and, whatever its decision, clearly articulate their effect...." *Taylor*, 487 U.S. at 336, 108 S.Ct. at 2419 (1988). Like a Speedy Trial Act dismissal, a court exercising discretion under Section 9 must completely consider all of the factors relevant to the options available under the Act. *Id.* at 344, 108 S.Ct. at 2423.

Both of the district courts considered the factors listed in Section 9(1) in successive order. First, they considered the seriousness of the crimes at issue. Kurt argues that the district courts mistakenly used a totality of the circumstances-type test to measure the seriousness of all three crimes, rather than the specific crime before the court. Furthermore, he argues that the courts should not have looked to the Sentencing Guidelines to gauge the seriousness of the particular offense. Kurt objects to these inquiries as an affront to the purposes of the IADA. He points out that a consideration based solely upon the defendant's disposition to commit crimes ignores the prisoner's rehabilitative needs. Kurt, however, takes an unreasonably restricted view of the district court's separate findings and offers no suitable alternative to their approach.

Both district courts took a broad view of the seriousness of the offenses at issue. Judge Thompson's opinion reads as follows:

> Kurt was convicted of possession of an unregistered machine gun ... and failure to appear on that charge.... These are serious offenses. The machine gun count alone carries a possible maximum sentence of ten years in prison. The court also notes that Kurt was convicted of possession of counterfeiting paraphernalia in the related case before Judge Quackenbush.

*United States v. Kurt,* Nos. CR–88–012 & 88–393, at 12–13 (E.D.Wash. Oct. 4, 1990) (Order granting dismissal without prejudice) (citations omitted). Meanwhile, Judge Quackenbush found that the counterfeiting paraphernalia charge carried a maximum possible penalty of 20 years and a $250,000 fine. The court stated that in considering Kurt's criminal history, a probable guideline sentence would be 48 months. Finally, the court stated that it was "cognizant of the fact that in his first trial in this district before Judge Thompson, the defendant was convicted for unlawful possession of a machine gun and failure to appear for trial on that charge." *Kurt,* No. CR–88–029, at 7 (E.D.Wash. Sept. 12, 1990) (Order granting dismissal without prejudice).

Neither court specifically relied on Guidelines computations or on the existence of related offenses. Since Congress filed no legislative history with the enactment of Section 9, 1988 U.S.Code Cong. & Admin.News 5937, and since no cases have specifically addressed this issue, nothing would appear to narrowly limit the scope of the district court's inquiry. Indeed, analogous case law requires the district court to take a broad view. Our treatment of dismissal orders construing similar language in the Speedy Trial Act indicates that the district court must make thorough and specific findings of fact to support its decision to dismiss without prejudice. *White,* 864 F.2d at 661 (citing *Taylor,* 487 U.S. at 342–44, 108 S.Ct. at 2422–23).

In both cases before us on appeal, the district courts thoroughly reviewed the facts pertinent to the seriousness of the offenses at issue. Not only does Kurt face substantial penalties for each of his offenses, the factual findings indicate that the defendant had the materials and ability to produce counterfeit bills, to protect his illicit business with unregistered firearms, and to avoid prosecution. When viewing these findings as a whole, we conclude that the district courts had ample evidence with which to arrive at their conclusions that Kurt's offenses are serious within the meaning of Section 9(1).

Next, both district courts analyzed substantially the same facts and circumstances that led to dismissal. Both courts noted specifically that Kurt's speedy trial clock had not exceeded the 70 day limit. In addition, they noted that the shuffling back to Oregon in violation of the IADA occurred at the behest of the court, not the prosecutor. The court originally transferred Kurt to comply with his request for library access. Since the Washington District Courts had limited pre-trial housing and since library access in Washington lies over twice as far from the court as that available in the receiving state of Oregon, ordering his return simply made geographic sense. Finally, the record reveals that Kurt originally requested his swift return to Oregon after the court issued its order to transfer him there. Only after his return to Washington the second time did Kurt raise his IADA defense.

Kurt argues that regardless of the origin or motive of the transfer, the deleterious effects of the IADA violations upon his rehabilitation require dismissal with prejudice. Kurt relies on the following quotation in *Reed:*

> [A] prisoners' [sic] rights under the IADA should not be subject to intentional or negligent sabotage by government officials. To adopt the government's position would allow prison officials to undermine prisoner's speedy trial rights by neglecting to perform their statutory duties.

*Reed,* 910 F.2d at 626 (quoting *United States v. Smith,* 696 F.Supp. 1381, 1384–5 (D.Or.1988)). His reliance on this language is misplaced. In *Reed,* we went on to remand the case to the district court to determine whether the violation warrants dismissal without prejudice pursuant to Section 9(1). *Id.* The facts and circumstances of the *Kurt* cases indicate that the court had little or no choice but to issue orders in violation of the IADA.

Finally, both courts found that reprosecution would not have an adverse impact on either the administration of the IADA or the administration of justice. To support the finding that dismissal without prejudice

would not demean the administration of justice, both courts noted that Kurt established no showing of prejudice as a result of the IADA violations. His return to Oregon and subsequent delay before trial occurred as a direct result of the court's concern for Kurt's access to a law library. Since Kurt defended himself in the district court proceedings, access to library materials was crucial to his defense.

Neither did the courts find offense to the administration of the IADA. Both found that the prosecution played no role in the IADA violations. Specifically, Judge Thompson found that since the sanction of dismissal with prejudice serves to prevent prosecutorial abuse of the detainer, *see, e.g., Dixon,* 592 F.2d at 336; *Ford,* 550 F.2d at 337–340, it would not offend the purposes of the IADA to dismiss without prejudice where the prosecution played no role in the violations. In addition, the district courts concluded that interference with Kurt's education and rehabilitation at the Oregon prison would have occurred in any event regardless of the IADA violations. And, finally, Judge Quackenbush stated that no long-term effects on the administration of the IADA will result because the court had not adopted nor does it intend to adopt a policy of prisoner transfer and scheduling that conflicts with provisions of the IADA.

Kurt's arguments to the contrary on this issue lack substance and merit. The court's review of the prejudice to Kurt as a result of the IADA violations directly bears upon the administration of justice. Furthermore, a reprosecution that would not offend the purposes underlying the IADA would not impair the continuing administration of the IADA. Nothing in the record indicates that continuing trial court congestion in the Eastern District of Washington threatens to play havoc with prisoner programs in sending states through detainer abuses. Both district courts made sufficient factual findings to support their conclusions that reprosecution would not impair either the administration of the IADA or the administration of justice.

## CONCLUSION

Consistent with our decisions regarding dismissals pursuant to Speedy Trial Act, both district courts in this action made specific factual findings with regard to the factors listed in Section 9(1) of the IADA. These findings support the courts' conclusions that dismissal without prejudice was warranted under the IADA. Therefore, we conclude that in both of Kurt's cases ·on appeal from the Eastern District of Washington, the district courts did not abuse their discretion in ordering dismissals without prejudice. Accordingly, we affirm.